[L. A. No. 18647. In Bank. Aug. 8, 1944.]

THE PEOPLE, Appellant, v. PURITAN ICE COMPANY (a Corporation), Respondent.

PURITAN ICE COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, as State Treasurer, etc., Appellant. (Four Cases.)

Robert W. Kenny, Attorney General, H. H. Linney, Assistant Attorney General, and Adrian A. Kragen, Deputy Attorney General, for Appellants.

Schauer, Ryon & McMahon and Alfred D. Haines for Respondent.

CARTER, J.—These causes consist of five actions, one by the State, appellant, to recover sales taxes alleged to be due under the Retail Sales Tax Act (Stats. 1933, p. 2599; Deering's Gen. Laws, 1937, Act 8493; now in Revenue & Taxation Code, §§ 6001-7176), and four actions by respondent for refund of taxes paid under protest. The respondent was successful in all of the actions and hence, we must view the evidence in a light most favorable to it.

Respondent is in the business of manufacturing and selling ice. Its business, in the instant cases, embraces two classes of buyers of its product, both of which are concerned with the use of ice in packing fresh vegetables for shipment.

First, 25 per cent of respondent's business involves sales of ice to the Pacific Fruit Express Company, a corporation engaged in renting refrigerator cars. The ice is placed by the express company in the bunkers of the cars. The express company's charges were made to the buyers of the vegetables which were shipped in the refrigerator cars by the shippers and packers. In 90 per cent to 95 per cent of the cases the express company in its billing sets forth a specific charge for the ice put in the bunkers, the rate usually being $3.50 per ton. In the remaining 5 per cent to 10 per cent the charge for the refrigerator car is a lump sum, a part of which is a charge for the ice, the balance being $5.00 for the use of the car. That is called standard refrigeration. The crates of

vegetables contain ice in the manner hereinafter mentioned, but with that the express company has no concern.

Second, the remaining 75 per cent of respondent's business was selling ice to the packers and shippers of the vegetables who were serving markets in the eastern states. From those buyers respondent received resale certificates certifying that the ice was purchased for resale. The vegetables were placed in crates lined with paper and packed in ice. The railroad cars used by them which were not refrigerator cars were iced as follows: After the car was loaded with crates of vegetables, ice was placed at the door and crushed ice was blown over the top of the crates, forming a mass called "top ice," the amount thereof varying according to the requirements of the eastern buyers of the vegetables. The car unit was called the iceberg pack. When the car arrived at its desination 70 per cent to 75 per cent of the car ice was intact. The crates were taken from the cars to transporting trucks and some of the ice shoveled onto the trucks.

In both classes where the vegetables were sold to small retail dealers, the latter opened a few crates at a time and, a considerable portion of the crate ice being intact, they would remove the vegetables and discard the ice, or place it on the remaining crates on hand or on the counter from which the vegetables were sold. Seventy-five per cent of the vegetables were sold by the shippers and packers f. o. b., the point of shipment in California. The remaining 25 per cent was sold either while en route to the eastern markets or after arrival. The carload lots of the products, at least as to that portion sold f. o. b. California, were sold as a unit including the produce, crates, packing and crate and car ice, the latter being separately itemized on the bill at $30 to $60 per car according to the tonnage involved. The crate ice was not separately itemized.

The trial court found that respondent "was the manufacturer of all of the ice, the sales of which are involved in said action; that the defendant, as such manufacturer, sold all of said ice to persons, firms and corporations who purchased same for the purpose of 'resale in the regular course of business in the form of tangible personal property', and who resold same for the purpose of 'resale in the regular course of business in the form of tangible personal property'."

648

The Retail Sales Tax Act imposes a tax on retail sales. Section 2(c) thereof defines such a sale as follows: "A 'retail sale' or 'sale at retail' means a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property. . . ." (Deering's Gen. Laws, Act 8493.)

■ The question involved is whether respondent's transactions constituted sales at retail as above defined. The answer must be in the affirmative. The case of *People* v. *Monterey* [*County*] *Ice & Dev. Co.*, 29 Cal.App.2d 421 [84 P.2d 1069], is decisive of the issue. That case involved the question of whether a sale was a retail sale as defined in the Retail Sales Tax Act. It is said:

"The evidence showed that appellant sold large quantities of ice to said packers during the period in question; that said ice was sold to the packers in 300-pound blocks at $3.00 per ton; that it was used by said packers in icing lettuce for shipment in carload lots; that each carload contained approximately 300 crates of lettuce; that said ice was crushed by the packers and the lettuce was iced by putting some of the crushed ice in each crate and by blowing a large quantity of crushed ice into the top of each car after the crates had been loaded; that approximately 10 tons of ice was used in so preparing each car for shipment; that in the nature of things, some of the ice was lost by melting during the crushing and preparation for shipment and some of the ice was lost by melting during shipment.

"The evidence further showed that about 64 per cent of the carload lots shipped by the packers were sold by them for cash, f. o. b. Salinas; *that there was a custom in the trade of making a separate charge to the purchasers on such f. o. b. shipments for the icing at the rate* of $30 per car; that the customary form of invoicing was 'top ice—$30'; that carload lot shipments, representing the remaining 36 per cent of the total, were principally 'consignment sales,' 'delivered sales' and 'wire rolls'; that such 'sales' were not f. o. b. sales and in some instances no sales of such shipments were made due to the demoralized condition of the market and in other instances, sales of such shipments, in whole or in part, were made at sacrifice prices. In none of these instances, was any separate charge made for icing but the lettuce was sold, if sold at all, for whatever price could be obtained at the point

of destination. Not all of the packers kept separate 'ice accounts' but, accepting *appellant's* figures and calculations, it appears that the packers recouped only a part, but not more than an average of 63 per cent, of the cost of the ice by making the above-mentioned charges for icing.

"Certain further facts should be mentioned. The evidence showed that appellant was in the business of producing ice and of selling the same at both wholesale and retail. It made a return on those sales which were admittedly retail sales and paid the tax thereon. It made a return on the sales here involved but claimed that they were not retail sales within the meaning of the act and it therefore paid no tax thereon. *Each of the packers had furnished to appellant the certificate prescribed in section 17 of the act stating that the ice was purchased* 'for resale in the form of tangible personal property'. . . .

"Appellant claims first, that the purpose of a sale is the criterion of taxability under the act and second, that the uncontradicted evidence in the present case showed that the purpose of the sales involved was 'for resale in the form of tangible personal property' and that the trial court therefore erred in finding to the contrary. We may assume, without deciding, that appellant is correct in stating that purpose is the criterion notwithstanding the fact that the property, which is the subject of the sale, or some of such property, may not be in fact resold. We cannot agree, however, that the trial court erred in making findings adverse to appellant with respect to the purpose of said sales.

"In a memorandum opinion, the views of the learned trial court judge were expressed in part as follows: 'The defendant in its brief states that the criterion of taxability is purpose. I think the record clearly shows that the purpose for which this ice was bought by the packers and shippers was for the purpose of preserving and protecting lettuce in order that they might sell it outside of the Salinas Valley. They did not buy this ice for the purpose of selling ice, but they bought it for the purpose of preserving lettuce, in order that it might be sold in foreign markets at a profit. . . . None of the ice involved in this proceeding was sold for the purpose of resale in the form of tangible personal property within the meaning of that definition. . . . In selling a carload of lettuce packed

in ice in the manner testified to at the trial these shippers are merely selling a refrigeration service necessary and incident to the conduct of their business. They do not sell ice any more than they sell lettuce crates.'

"We are in accord with the reasoning set forth and the conclusion reached in said memorandum opinion. While the case of *National Ice & Cold Storage Co. v. Pacific Fruit Express Co., supra,* [11 Cal.2d 283 (79 P.2d 380)] is distinguishable, *the evidence here showed that the real purpose for which the ice was purchased by the packers was to preserve and protect lettuce during the shipment of said lettuce to their customers.* In other words, it was purchased for the purpose of furnishing a refrigeration service as a necessary incident of the packers business of selling lettuce. . . . Appellant points to the fact that *none of the purchasers in the cited cases made a separate charge to its own customers for such materials in addition to the price charged for its own merchandise.* This is true but it may be recalled that the packers made a separate charge for icing only in certain cases. *But even assuming that a separate bookkeeping entry had been made for icing in all cases, we are of the opinion that the principle remains the same and that the sales of ice by appellant to the packers for the purpose of preserving and protecting their product during shipment would still be taxable. Neither a trade custom nor a bookkeeping entry with respect to the charge made by the packers for such icing could change the real purpose of the sale by appellant to said packers or affect the taxability thereof.*" (Italics added.)

Respondent asserts, however, that in the Monterey case the appellate court was affirming the judgment of the trial court which had found on conflicting evidence that the purpose of the sale of the ice was not for resale by the purchaser; that in the instant case the trial court found, as appears from the finding heretofore quoted, that the purpose of the sale of the ice to the packers and shippers and express company was for resale by the purchasers and not for use or consumption by them, and that such finding may not be disturbed as it finds support in the evidence; and that there are several factors requiring the conclusion that the sale was for resale, such as, that resale certificates were given by the purchasers, each car load of vegetables with its contents of lettuce, crates, crate ice and car ice was sold as a unit, and the crate of vegetables

with its ice was a unit, that the purchasers of the vegetables were billed separately for the ice and a profit was made thereon, and that a large proportion of the ice was intact when the shipment arrived at the eastern markets.

It has been said that the question of whether a sale is one at retail is one of fact for the trial court. (*National Ice etc. Co.* v. *Pacific F. Exp. Co.*, 11 Cal.2d 283 [79 P.2d 380], and of course, the determination of a factual issue by the trial court upon conflicting evidence is conclusive upon an appellate court. Yet where, as in the instant case, the evidence taken most favorable to the respondent, reasonably leads to only one conclusion, that rule is not applicable. While it is true that the decision in the Monterey case was an affirmance of a trial court's finding, nevertheless the language therein clearly indicates that the given factual background requires the conclusion that such a sale is one at retail rather than for resale. From the foregoing quotation from the Monterey case it is manifest that a sale is not one for resale where the ice was sold to vegetable packers for icing the vegetables in carload lots; that the method of icing the car was substantially the same as in the case at bar, that a large percentage of the vegetables were sold f. o. b. California; that it was the custom of the trade for the packers to make a separate charge for the ice and it was billed as a separate item; that certificates were given by the purchasers stating that the sale was for resale; and that the vegetables were sold both f. o. b. California and during transit. Hence, under the Monterey case the factors of separate billing of the ice, and the sale of the whole unit in a carload lot and the issuance of resale certificates are not controlling. The only additional factors in the instant case are a purported profit made on the ice and the details with reference to the disposal of the ice after the produce reaches the markets. However, the situation must be examined realistically. Whether we take the view of one of respondent's witnesses that the ice is used to make the vegetable more attractive and salable or that the ice is purchased solely for preserving the vegetables, the result is the same. The essence of the matter is that the purchasers of the ice are acquiring it for purposs other than resale. They are not engaged in the ice selling business. They are selling vegetables and the use of the ice or purported sale thereof to the purchasers of the

vegetables is merely an incident of that activity. It is common knowledge that the dominant purpose for the use of ice in shipping perishable produce is to preserve the produce by means of refrigeration. Realistically, the purchasers of the vegetables are not concerned with acquiring ice as such. They are buying vegetables which are protected against deterioration and which will be in a marketable condition when offered for sale by them. Actually, the ice does not become a component part or ingredient of the vegetables, even though the sale is made of the so-called iceberg pack of vegetables. It is an aid in maintaining the condition of the merchandise, and rather than becoming a part of the merchandise, it merely maintains it at the *status quo,* eventually being completely exhausted in the process. Nor does the profit factor with respect to the ice alter the result. Like the charge for the ice, the purported profit on the ice truly should be considered as merely an incidental part of the sale of the vegetables—the sale of vegetables to be shipped in such a condition that they would not lose their value.

Respondent contends that the rules and regulations of the Board of Equalization, the agency entrusted with the enforcement of the Retail Sales Tax Act, to the effect that the sales of crates, wrappers, containers and labels to packers, fertilizer to farmers selling their produce and feed to poultry producers, are not taxed to the sellers thereof because they are sold for resale, results in an unjust discrimination between similar types of merchandise. Nothing is said in such rules about ice, or icing or refrigeration. Hence, such rules cannot have any application to the instant case. Whether those rules are right or wrong is a matter upon which we express no opinion. If they are contrary to the correct interpretation of the statute they are invalid. If they result in illegal discrimination they are likewise invalid. But those are matters with which we are not now concerned. The issue here involved is ice, and not containers. It may be observed that there are conflicting authorities on the general subject as to what sales are sales for purposes other than resale. (See 139 A.L.R. 372; 115 *id.* 491; 111 *id.* 943; 98 *id.* 837.) But we believe that the fundamental principles are correctly stated in the Monterey case and agree with its reasoning.

Finally, it is of some significance that in 1943, after the decision in the Monterey case holding that ice sold to packers

of vegetables is not a sale for retail, the Legislature passed a bill amending the Retail Sales Tax Act, by adding section 6359.5 thereto reading: "As incidental to the exemption provided for in Section 6359, there are exempted from the taxes imposed by this part, the gross receipts from the sale of and the storage, use, or other consumption in this State of containers, ice, packing materials and labels used or employed in packing, shipping or transporting food products." Section 6359 referred to, exempts food products from the sales tax. Although that bill was vetoed by the Governor, still its passage by the Legislature indicates an impression on its part that it was necessary specifically to exempt ice sold for such purpose. Otherwise, it would be subject to the tax. It is quite natural that the Legislature would have that thought in view of the decision in the Monterey case. True, there may have been a dispute with respect to whether the food products exemption embraced ice for preservation of the food, a factor not considered in the Monterey case, and hence, there might be some reason for applying the rule that the legislation was intended for clarification and not to change the law (see *Standard Oil Co.* v. *Johnson,* 24 Cal.2d 40 [147 P.2d 577] ; *Union League Club* v. *Johnson,* 18 Cal.2d 275 [115 P.2d 425]), but here the basic issue of whether such sales were taxable had at least partially settled any dispute.

For the foreing reasons the judgment in each of the causes is reversed.

Gibson, C. J., Shenk, J., Curtis, J., and Edmonds, J., concurred.

Traynor, J., and Schauer, J., did not participate.

Respondent's petition for a rehearing was denied September 1, 1944. Traynor, J., and Schauer, J., did not participate therein.