KUSKIN, J.T.C.
Plaintiff, UPS Oasis Supply Corporation, seeks a refund of sales or use tax[1] in the sum of $276,128 paid by it in 1999 pursuant to *322 the New Jersey Sales and Use Tax Act, N.J.S.A 54:32B-1 to -29, in connection with a purchase of computer equipment. Plaintiff asserts two bases for its refund claim:
1. the purchase of the equipment was for purposes of resale, and, therefore, no tax was due; and
2. even if the purchase was taxable, the purchaser was a sister corporation, and plaintiff is not liable for the tax obligation of that corporation.
For the reasons set forth below, I deny the refund claim.
Plaintiff is one of over two hundred wholly-owned subsidiaries of United Parcel Service of America, Inc. (“UPS-America”). Plaintiff was formed in or about 1997 and began operations in 1998. United Parcel Service General Service Co. (“General Services”) is another wholly-owned subsidiary of UPS-America.
Pursuant to an agreement initially signed in 1938 and amended and restated effective January 1, 1999, UPS-America rendered management and administrative services to its operating subsidiaries in exchange for a percentage of their gross receipts. In 1957, UPS-America entered into a Management Services Agreement with General Services under which UPS-America subcontracted to General Services certain management, financial, professional and administrative services. As set forth in the January 1, 1999 amended and restated version of this agreement, the duties and responsibilities undertaken by General Services included the following:
1. providing accounting, financial and tax services;
2. making available to operating subsidiaries credit and cash management facilities as necessary for their needs; and
3. managing and controlling the tangible and intangible property owned by the operating subsidiaries or used by them in their business operations.
General Services owned and operated the primary data processing facility for the worldwide operations of UPS-America and its subsidiaries. This facility has been located in Mahwah, New Jersey since 1991. Until sometime between 1997 and 1999, approximately sixty-five separate district accounting offices existed within the UPS-America organization, one of which was at the *323 General Services facility in Mahwah. The accounts payable department in each district accounting office was responsible for payments to vendors for goods or services purchased by a subsidiary within the district, including any sales tax due to the vendor if the tax was included in an invoice. When a vendor did not collect applicable taxes, the district accounts payable department paid use tax to the appropriate taxing authority.
Beginning in 1995, UPS-America undertook a project (the “Oasis Project”) to centralize purchasing and accounts payable functions for all subsidiaries. As part of this project, plaintiff was formed, as was UPS Procurement Services Corp. (“Procurement”), another wholly owned subsidiary of UPS-America. The two new entities were parties to a Procurement Services Agreement with UPS-America effective January 1, 1999. This agreement defined Procurement’s function as negotiation with vendors for purchases of goods and services on behalf of all UPS-America subsidiaries. Plaintiffs functions were defined as follows:
Under the direction of UPS-Procurement, UPS-Oasis will purchase tangible personal property and services for resale to the Operating Companies. Resale of property and services to the Operating Companies will be at cost. Under the direction of UPS-Procurement, UPS-Oasis will collect and remit sales/use and similar transactional taxes on its sales to the Operating Companies and will file the appropriate tax returns.
In order to perform these functions, plaintiff developed a computerized system (the “Oasis System”). The Oasis System was divided into two sections, one referred to as the “Oracle” section and the other referred to as the “Vertex” section. The Oracle section was programmed to identify by product code those purchases which were subject to sales and use tax in each state of the United States. When an approved purchase was entered into the System, the Oracle section would generate a purchase order to the vendor. When a vendor issued an invoice in response to a purchase order, the invoice would be input into the Oracle section which would match the invoice with the purchase order and determine whether the purchase was taxable. If the purchase was taxable, information relating to the purchase would be transferred to the Vertex section which would prepare an invoice to the UPS-America subsidiary to which plaintiff resold the goods and ser *324 vices. This invoice would include the sales or use tax payable in connection with the resale. The amount so determined would be included in a tax register for the appropriate jurisdiction, and the Vertex section paid the tax when due.
The Oasis System did not become operational until the Spring of 1998. Plaintiff introduced and implemented it at individual district accounting offices between May 1998 and 1999. The General Services facility in Mahwah was among the last to receive the Oasis System. To allow time for training at each district accounting office, the previous accounts payable system remained operational for a period of time in parallel with the Oasis System. At the General Services facility in Mahwah, this parallel functioning continued through late 1999.
The Oasis System was not used for all operating subsidiary purchases. Certain purchases, among which were purchases of vehicles, aircraft, and construction materials, were made directly by the operating subsidiaries. As to those purchases, plaintiff was not a reseller but did pay sales and use taxes as the payment agent for the purchasing subsidiary.
In addition to centralizing the purchasing and accounts payable functions, the Oasis Project eliminated concerns as to miscalculations of sales and use taxes by vendors. All sales to plaintiff would be sales for resale not subject to tax, and, therefore, plaintiff would calculate applicable sales and use taxes payable in connection with the resales to other UPS-America subsidiaries. As part of the implementation of the Oasis System, plaintiff prepared a standard form blanket resale certificate and distributed a copy to each of the over fifty thousand vendors providing goods and services to the various UPS-America subsidiaries.
In 1998, General Services leased from Hitachi Data Systems Credit Corporation (“Hitachi”), a Skyline Model 427 computer (the “Skyline”), for installation at the Mahwah facility. The lease term commenced on March 1, 1998 and expired on February 28, 2001. This transaction was accomplished pursuant to a supplement to a master lease between UPS-General Services and Hitachi’s predecessor in interest, the term of which commenced in 1987. The *325 master lease supplement relating to the Skyline equipment reflected that New Jersey sales tax of $268,249 was computed based on the aggregate lump sum of the lease payments. Because the Oasis System was not yet operational at Mahwah, General Services paid the tax amount to Hitachi.
Soon after installation of the Skyline, General Services determined that the computer had insufficient capacity for its requirements. In order to accommodate General Services’ needs, Hitachi activated previously dormant microprocessors located within the Skyline computer. This activation was accomplished by entering codes into the computer. As a result, the computer leased as a Skyline 427 became the equivalent of a Skyline 627. In order to satisfy its needs, however, General Services did not need all of the additional processors, and the Hitachi computer was operated as if it were a Skyline 527 model.
Several months after the Skyline was installed at the General Services Mahwah facility, International Business Machines Corporation (“IBM”) announced the availability of a faster computer. IBM approached General Services about replacing the Skyline with IBM equipment, and proposed a transaction whereby General Services would purchase the Skyline from Hitachi, IBM would, in turn, purchase the Skyline from General Services for a purchase price equal to that payable by General Services to Hitachi, and then General Services would lease the IBM computer.
Pursuant to these discussions with IBM, General Services arranged with Hitachi for the purchase of the Skyline. On March 29, 1999, Hitachi issued a letter to General Services stating as follows:
As requested below is the purchase price for the Skyline 427. The machine is currently configured as a 627. To simplify the transition, HDS 1 (Hitachi Data Systems)] will allow the machine to remain configured as a 627 until the end of April. The purchase price for the 427 will remain the same $4,602,123.
Thereafter, General Services and Hitachi entered into a formal agreement for the purchase of the Skyline computer. The agreement, signed by General Services on March 31, 1999 and by Hitachi on March 29, 1999, provided that April 1, 1999 was the effective date of the sale and that title would transfer “a) on the *326 later of the effective date listed above or the date payment in full is received by Lessor and b) when all Lessee obligations under the Lease have been met.”
By agreement signed by United Parcel Service Inc. (and not General Services) on May 14, 1999 and by IBM on February 22, 2000 (the delay in signing by IBM was not explained), IBM agreed to purchase the Skyline. The agreement described the equipment as a Hitachi Skyline 427, and provided that title to the equipment would pass to IBM “when picked up by Buyer at Seller’s designated location.” IBM was obligated to make payment of the purchase price in full “within thirty days after notice that the equipment is ready for pick-up.” A schedule attached to the agreement set forth a pick-up date of April 30, 1999. Plaintiff presented no evidence as to when, if ever, United Parcel Service Inc. or General Services notified IBM of a different date on which the equipment was ready for pick-up. IBM paid the agreed purchase price to Hitachi in two installments, one in the sum of $2,220,832 on March 30, 1999, and the balance by check dated June 4, 1999. The agreement provided that IBM’s purchase was “for resale or lease” and that IBM would “furnish ... a sales tax exemption certificate.” IBM did not supply any such certificate, and plaintiff produced no evidence that it collected or paid sales tax on the sale to IBM.
Hitachi rendered its invoice to General Services for the Skyline 427 on March 29, 1999 indicating a due date of April 1,1999. The invoice reflected a calculation of sales tax due on the transaction in the sum of $276,127.92. After a credit for “N.J. upfront tax paid” of $170,227.82, the net amount of tax shown as due was $105,900.10. Plaintiff was unable to explain this tax computation, particularly the computation of the credit.
As a result of the omission from the Hitachi invoice of a UPS purchase order number and the inclusion of a sales tax computation, General Services advised Hitachi that a purchase order would be issued and that Hitachi should prepare a new invoice containing the purchase order number and eliminating the sales tax computation because General Services was acquiring the Skyline for purposes of resale.
*327 Although the General Services accounts payable operation was still functioning at the time, the purchase order for the Skyline was generated through the Oasis System. This document, dated May 12, 1999, shows plaintiff as the purchaser and Hitachi as the vendor, and contains the notation “HDS Skyline 427 Lease PayOut and FMV Buy-Out.” Plaintiff also provided Hitachi with a copy of a “Uniform Sales and Use Tax Certificate — Multi-Juris-diction,” that described all purchases as tax free because, among other reasons, they were for resale. This document, dated October 8, 1998, identified the buyer of the equipment as “UPS Oasis Supply Corporation” with offices in Roswell, Georgia. The certificate was one of the standard form blanket resale certificates described above. Plaintiffs name, as buyer, was pre-printed on the form, and Hitachi, as seller, was filled in. Hitachi did not generate a revised invoice until August 30, 1999. This invoice stated that “Sales tax has not been added because UPS is purchasing this equipment for resale” and showed the agreed purchase price of $4,602,132. General Services, not plaintiff, paid the invoice by check dated September 20, 1999, but plaintiff paid sales or use tax to New Jersey through the Oasis System.
The IBM computer equipment was installed and operational at the General Services facility in Mahwah as of April 25, 1999. Between that date and approximately April 30, 1999, the Skyline remained operational at the facility as a backup to the IBM equipment. Thereafter, the Skyline remained at the General Services premises, in the computer room, until September 1999 when IBM picked up the equipment. No application ran on the Skyline during this latter period, but the record does not reveal whether the equipment remained powered up and available for use or whether it was powered down and in storage. A witness presented by plaintiff testified that he did not know whether the equipment was physically powered down. The witness stated that the person with such knowledge would be “somebody within our [(General Services’)] computer operations group.” No representative of the computer operations group testified.
In 2001, plaintiff realized that it had paid duplicate sales tax on over one thousand three hundred transactions where the tax also *328 had been paid by one of the district accounting offices outside of the Oasis System, and that it had paid tax on the General Services purchase of the Skyline from Hitachi. On October 15, 2001, plaintiff filed a refund claim relating to all of these transactions. The Director granted refunds of the duplicate payments but denied the refund as to the General Services-Hitachi transaction where no duplicate payment had been made. This appeal followed.
Plaintiff contends that the foregoing facts demonstrate that General Services’ purchase of the Skyline was for purposes of resale to IBM and, therefore, not subject to sales or use tax. N.J.S.A. 54:32B-3(a) imposes sales tax on the receipts “from every retail sale of tangible personal property, except as otherwise provided in this act,” and N.J.S.A. 54:32B-6 imposes use tax for “use within this State ... of any tangible personal property purchased at retail.” A “purchase at retail” is a “purchase ... at a retail sale.” N.J.S.A. 54:32B-2(b). The statutory definition of a “retail sale” is “a sale of tangible personal property to any person for any purpose other than ... for resale either as such or as converted into or as a component part of a product produced for sale by the purchaser....” N.J.S.A. 54:32B-2(e)(1) (emphasis supplied).[2]
In response, defendant, Director of the New Jersey Division of Taxation (“Director”), asserts that, even if General Services intended to, and did, resell the Skyline to IBM, between the date General Services acquired the equipment and the date of consummation of the resale to IBM, General Services used the Skyline within the meaning of N.J.S.A. 54:32B-2(h), thereby rendering the purchase subject to sales or use tax. This statute defines “use” in relevant part as follows:
*329 The exercise of any right or power over tangible personal property by the purchaser thereof and includes, but is not limited to, the receiving, storage or any keeping or retention for any length of time, withdrawal from storage, any distribution, any installation, any affixation to real or personal property, or any consumption of such property.
Specifically, the Director contends that General Services’ use of the Skyline consisted of keeping the equipment operational for the period April 25 to April 30 and retaining possession of the equipment from April 30, 1999 through sometime in September 1999 when the equipment was available lor use in the event the IBM equipment was not functioning satisfactorily. Plaintiff responds that General Services made no post-purchase “use” of the equipment because the operation of the Skyline as a backup from April 25 through April 30, 1999 was pursuant to the equipment lease agreement with Hitachi for which rent had been paid for the month of April 1999. Plaintiff further asserts that, although the equipment was at General Services’ premises after April 30, the equipment was not being used.
As a second basis for seeking a refund of the sales or use tax it paid, plaintiff contends that it had no liability for the tax paid and that it paid tax erroneously. In support of this contention, plaintiff notes the transactions involving purchases by UPS-America subsidiaries that were run through the Oasis System and resulted in duplicate payments of tax by plaintiff. Plaintiff asserts that the only reason it made these duplicate payments, and the tax payment with respect to the General Services purchase from Hitachi, was a flaw in the Oasis System computer program. The flaw, as described by plaintiff, was that, when a transaction was reversed in the Oracle section of the System (that is, an approved purchase was cancelled in the Oracle section), the Oracle section did not communicate properly with the Vertex section. As a result the Vertex section was not aware that any tax liability with respect to the cancelled purchase should also be cancelled, and the Vertex section paid sales or use tax. Thus, plaintiff asserts, even though the Skyline purchase was removed from the Oracle section of the Oasis System (presumably because General Services paid or was to pay the sales price to Hitachi) the tax on the purchase was *330 retained in the Vertex section as due and payable and was remitted erroneously to New Jersey.
In response to plaintiffs contentions as to an erroneous payment, the Director notes that plaintiffs responsibilities as described by its witness included acting as a payment agent for other UPS-America subsidiaries even where plaintiff was not the purchasing entity of taxable goods and services. If another UPS-America subsidiary acquired goods and the purchase was subject to sales or use tax, plaintiff could be designated to pay the tax as the payment agent for the subsidiary. The Director contends that plaintiff acted as payment agent for General Services with respect to the Skyline purchase from Hitachi. The Director also asserts that plaintiff was directly involved in the transaction with Hitachi as evidenced by the purchase order and the resale certificate plaintiff issued to Hitachi, both of which named plaintiff as the purchaser. Plaintiff counters that, in the Oasis System, no mechanism existed for issuing a purchase order in the name of any UPS-America subsidiary other than plaintiff and the only resale certificate available showed plaintiff as the purchaser.
I will address first the issue of whether the purchase by General Services from Hitachi was a sale for resale exempt from New Jersey sales and use tax.
The purpose of the sale for resale exemption is “to avoid tax pyramiding.” Steelcase, Inc. v. Director, Div. of Taxation, 13 N.J.Tax 182, 195 (1993). The exemption applies to both the sales tax and use tax. In McGraw-Hill, Inc. v. State Dept. of Treasury, Director, Division of Taxation, 9 N.J.Tax 372 (1987), Judge Lasser described the use tax as “a tax complementary to the sales tax as an aid to its enforcement. It is a tax on possession and enjoyment of that which was purchased and for which no sales tax was paid.” Id. at 382 (citation omitted). Based on this description of the role and function of the use tax, I conclude that, whether the tax the Director contends was due with respect to General Services’ purchase of the Skyline from Hitachi is characterized as sales tax or use tax, the analysis and result should be the same. In the sales tax context, the issue is whether the *331 purchase was for a use other than for resale, and, in the use tax context, the issue is whether General Services used the Skyline after the purchase and before consummation of the resale transaction.
No reported New Jersey decision has determined whether a sale can qualify as a sale for resale if the purpose of the acquisition was not only for resale but also for some interim use by the purchaser. In McGraw-Hill, the taxpayer initially purchased books for purposes of resale and placed them in its warehouse pending the resale. The taxpayer then decided to donate the books to a charitable organization and contended that the donations constituted resales so that its purchase of the books remained exempt from sales tax. Judge Lasser held as follows:
I find from the definitions of “retail sale” and “use” and from the cited wording of § 2(e) [N.J.S.A. 54:82B-2(e)l and § 6 N.J.S.A. 54:32B-6)] that the Legislature’s intent was to exempt both storage of tangible personal property and the withdrawal of this property from storage when the property is manufactured or purchased with the intention that it be resold. However, when the intent changes and resale is no longer intended, the tangible personal property becomes subject to use tax on withdrawal from storage and devotion to a non-resale use.
[Id. at 381-82.]
The taxpayer’s change of intention was:
manifested by taxpayer’s withdrawal of tangible personal property from storage for gift, rather than resale, purposes .. So long as the books were held in inventory with the intent to resell, they were not subject to use tax, but once taxpayer took steps to use the books for gift purposes, they were removed from the protection of § 2(e) and became subject to use tax under § 6.
[Id. at 382.]
The reliance in McGraw-Hill on the intent of the purchaser as the critical factor in a determination of whether a sale is for resale, is consistent with the approach taken by many courts around the country. However, different states have taken different positions as to the nature of the intent required for a sale to qualify for a sale for resale exemption. See, generally, II Jerome R. Hellerstein and Walter Hellerstein, II State Taxation ¶ 14.02(6) (3rd ed. 2000) (noting that purchases made with the intention to use the property and then resell it “give rise to considerable controversy, because there are reasonable arguments for characterizing the transaction as either taxable or non-taxable, and there *332 is no obviously ‘right’ resolution of the controversy.”) In New York, the sole and exclusive intent of the purchaser must be to resell. See, e.g., In re Savemart, Inc. v. State Tax Comm’n, 105 A.D.2d 1001, 482 N.Y.S.2d 150, 152 (1984) (defining the phrase “other than for resale as such” as reflecting a legislative intent that the resale exemption applies only when resale is the sole purpose of the purchase); accord In re P-H Fine Arts, Ltd. v. New York State Tax Appeals Tribunal, 227 A.D.2d 683, 642 N.Y.S.2d 232, 234 (1996). Other states have held that the sale for resale tax exemption is applicable if the primary purpose of the purchase is for resale. See, e.g., Burroughs Corp. v. State Bd. of Equalization, 153 Cal.App.3d 1152, 200 Cal.Rptr. 816 (1984); Dresser Indus., Inc. v. Bindley, 12 Ohio St.3d 68, 465 N.E.2d 430 (1984); Lone Star Indus. Inc. v. Dep’t of Revenue, 97 Wash.2d 630, 647 P.2d 1013 (1982).
The New Jersey courts have not addressed the issue of the appropriate standard for interpreting the language “other than for resale” appearing in N.J.S.A. 54:32B-2(e). In KSS Transportation Corp. v. Baldwin, Director, Division of Taxation, 9 N.J.Tax 273 (1987), however, the Tax Court held, in the context of deciding whether the taxpayer qualified for exemption under N.J.S.A. 54:32B-8.35 (a statute providing a sales tax exemption for receipts from certain sales of aircraft), that “a predominant use test is a reasonable interpretation of the statute.” Id. at 279-80. Applying a predominant use test in the sale for resale exemption context is equally reasonable and is consistent with the test applied determining whether the exemption applies to the providing of goods in connection with the rendering of services. There, our courts have applied a “true object” test to analyze the essence of the transaction and determine whether goods were provided simply as ancillary to a service or as an independent transaction qualifying for the sale for resale exemption. See Adamar of New Jersey v. Director, Div. of Taxation, 17 N.J.Tax 80, 95 (1997), aff'd, 18 N.J.Tax 70 (App.Div.1999).
Based on the preceding authorities, I conclude that the appropriate standard to be applied for purposes of determining whether General Services’ purchase of the Hitachi Skyline qualified for the *333 sale for resale exemption is the predominant or primary purpose test. In reaching that conclusion, I am cognizant of the recognition by our courts that decisions from New York are regarded as useful in interpreting the New Jersey Sales and Use Tax Act because our Act was drawn from the corresponding New York Act. See New Jersey Bell Tel. Co. v. Director, Div. of Taxation, 152 N.J.Super. 442, 450, 378 A.2d 38 (App.Div.1977) (Horn, J.A.D., concurring), certif. denied, 75 N.J. 594, 384 A.2d 824 (1978). However, in light of the decision in KSS Transportation and the application of the “true object” test, I conclude that the New York sole purpose test should not be applied and implicitly has been rejected by our courts. See Meadowlands Basketball Assocs. v. Director, Div. of Taxation, 340 N.J.Super. 76, 83, 773 A.2d 1160 (App.Div.2001) (“While New York’s sales tax statute served as the model for our statutory scheme, its interpretative decisions are, of course, not binding or controlling.” (citation omitted)).
I find and conclude that General Services’ predominant and primary purpose in acquiring the Hitachi Skyline was for purposes of resale to IBM. The facts demonstrate that, but for the transaction with IBM in which IBM would repurchase the Skyline, General Services would not have arranged to purchase the equipment from Hitachi and, presumably, would have continued to use the equipment for the balance of the three year- lease term. I also find and conclude, however, that this determination as to the primary or predominant purpose for General Services’ purchase does not require a conclusion that the purchase qualified for the sale for resale exemption from New Jersey sales and use tax.
Under the definition of “use” in N.J.S.A. 54:32B-2(h), even if the primary or predominant purpose for a purchase of tangible personal property is for resale, an interim use of the property can disqualify the transaction from the sale for resale exemption. See Larry J. Stroble and Sandra Cha Sifferlen, Sales Tax Exemptions in Retailing and Manufacturing: Resolving Mixed-Use Situations, 4 J. of Multi-State Taxation 244 (Jan./Feb. 1995) (discussing various tests for the sale for resale exemption, including one that requires not only that the taxpayer’s primary purpose be for an *334 exempt use, but also that any secondary use have a purpose not inconsistent with the resale purpose).
Our cases consistently have articulated the principle that tax exemptions are to be construed strictly and that the taxpayer has the burden of proving that it satisfies all of the elements necessary for such qualification. E.g., Metpath, Inc. v. Director, Div. of Taxation, 96 N.J. 147, 152-53, 474 A.2d 1065 (1984). Our Legislature has established a presumption that transactions are taxable.
For the purpose of the proper administration of this act and to prevent evasion of the tax hereby imposed, ... it shall be presumed that all receipts for property or services of any type mentioned in subsections (a), (b) and (c) of [N.J.S.A. 54:32B-3] ... are subject to tax until the contrary is established, and the burden of proving that any such receipt ... is not taxable hereunder shall be upon the person required to collect tax or the customer.
[N.J.S.A. 54:32B-12(b).]
Based on the quoted statutory provisions and the general principles applicable to exemptions, I conclude that, even if General Services’ primary purpose for the purchase of the Skyline was resale of the equipment to IBM, the transaction will not qualify for the sale for resale exemption if General Services made an interim use of the equipment inconsistent with the purpose of resale.
An interim use of tangible personal property is inconsistent with a primary purpose of resale if the interim use renders the property unavailable for resale for a meaningful period of time. If for example, a retail merchant purchases merchandise subject to sales tax in a large quantity but displays only a portion of the merchandise for sale, the purchase would constitute a sale for resale even as to the merchandise in storage and not on display. If a customer wished to purchase the merchandise on display and in storage, all of it would be immediately available for sale. So long as the storage is consistent with the resale purpose, no tax is imposed. If, however, the merchant made an interim use of some of the merchandise thereby rendering it unavailable for resale, that inconsistent use could result in a disqualification of the merchandise so used from the sale for resale exemption even if the merchandise later were sold. Cf. Burroughs Corp. v. State Bd. of Equalization, supra 200 Cal.Rptr. at 823, n. 9 (stating that, in applying the primary purpose test to a sale for resale exemption *335 claim, the decisive factor is “whether a substantial intervening use of the property has occurred at any time which is primarily undertaken for a purpose other than its subsequent resale.”) Fliteways, Inc. v. Lindley, 65 Ohio St.2d 21, 417 N.E.2d 1371, 1374 (1981) (holding that the purchases of aircraft for resale qualified for the sale for resale exemption, even though the purchaser used the aircraft in its charter service and flight training school, because the airplanes “remained available for resale at all times.”).
The foregoing analysis is applicable to the facts before me as follows. If the sale of the Skyline to General Services occurred on April 25, 1999, then the continuing use of the equipment by General Services for the period April 25 through April 30, as a back-up to the new IBM system, would constitute a sufficient use of the property by General Services, inconsistent with a resale purpose, so as to disqualify the purchase from the sale for resale exemption. During that period, General Services was unwilling to deliver the equipment to IBM. As discussed above, plaintiff contends that the purchase did not occur on April 25 because the monthly rent for April had been paid in full, and therefore its lease with Hitachi remained in effect through April 30. The sales agreement between Hitachi and General Services, however, sets forth April 1, 1999 as the “Effective Date of Sale,” and the initial invoice issued by Hitachi is dated March 29, 1999 and states an “Invoice Due Date” of April 1, 1999.
If I accept plaintiffs argument that the sale to General Services did not take place until May 1, then the issue becomes whether the use of the Skyline between that date and the date of delivery to IBM in September 1999 constituted a use inconsistent with the resale purpose.[3] Plaintiff failed to establish what the status of the Hitachi equipment was between May 1 and September. Although *336 a witness presented by plaintiff testified that the Skyline no longer was running any application, he was unaware of whether the equipment had been powered down and thus was unaware of whether the equipment could have been used by General Services in the event of a failure of the IBM equipment. The witness did not know why the equipment remained in the computer room at the General Services facility until September and testified that a representative of the General Services operations department would know. Plaintiff did not produce a witness from that department.
From the facts presented, I could infer that the equipment was simply in storage awaiting pick-up by IBM, or I could infer that the equipment was retained by General Services for purposes of back-up in the event of difficulties with the IBM equipment. Either inference would be equally logical and supported by the record. Consequently, I find and conclude that plaintiff failed to carry its burden of proving that the use of the Hitachi equipment by General Services was not inconsistent with a resale purpose. As a result of this failure and of the presumption of taxability in N.J.S.A. 54:32B-12(b), I find and conclude that the sale from Hitachi to General Services does not qualify as a non-taxable sale for resale.
Because I have concluded that the sale for resale exemption does not apply, I must address plaintiffs second basis for its refund claim, namely, that its payment of tax was in error, that it was not the entity responsible for the tax, and, therefore, it is entitled to a refund of any tax paid. Plaintiff asserts that a taxpayer’s corporate structure is binding upon it for purposes of liability for tax, see Household Fin. Corp. v. Director, Div. of Taxation, 36 N.J. 353, 362,177 A.2d 738 (1962), and, therefore, the structure is binding on the Director for purposes of establishing non-liability for tax. Plaintiff argues that the Director must respect the corporate structure of UPS-America, particularly the establishment of plaintiff and General Services as separate corporate entities. Plaintiff asserts that it had no liability for any taxes due from General Services and any payment made by it for an obligation of General Services should be refunded.
*337 Plaintiff’s arguments reflect a subtle but important mischarac-terization of the erroneous payment issue. The issue is not simply whether plaintiff and General Services were two separate corporate entities, neither being liable for the tax obligations of the other. The issue, properly stated, is whether, under the facts in the record, plaintiffs payment can and should be treated as a payment on behalf of General Services.
At the time plaintiff paid sales or use tax with respect to the Hitachi purchase, both the Oasis System and General Services’ accounts payable system were in operation, and General Services’ personnel were receiving training in the operation of the Oasis System. Plaintiff contends that, under the Procurement Services Agreement effective January 1, 1999, plaintiff’s tax payment authority and responsibilities were limited to payment of sales and use taxes with respect to those transactions in which it acquired property for purposes of resale to other UPS-America subsidiaries. Plaintiff asserts that it had no authority or responsibility to pay sales or use tax with respect to a transaction such as the General Services purchase from Hitachi, where the planned resale was to an entity other than a UPS-America subsidiary.
Plaintiff’s witnesses testified that the Oasis System was the only available system to process the Hitachi — General Services transaction, but other evidence established that the General Services’ accounts payable system and the Oasis System functioned simultaneously. Because of this simultaneous or parallel functioning of the two systems, I find that no necessity existed for running the General Services purchase of the Hitachi equipment through the Oasis System. On September 20, 1999, General Services issued a $4,602,132 check to Hitachi in payment for the Skyline. If the Oasis System was the only mechanism available to handle the account payable to Hitachi and any related sales or use tax obligation, then General Services’ payment to Hitachi is unexplainable and unexplained. A decision was made, either by General Services or plaintiff, or both, that the Hitachi transaction should be placed into the Oasis System and that, in effect, plaintiff would act as payment agent for General Services with respect to the Hitachi invoice, a role plaintiff had played in connection with *338 direct purchases of certain goods and services made by other UPS-America subsidiaries. Plaintiff’s remittance of sales or use taxes, therefore, can and should be viewed as a payment on behalf of General Services.[4] Cf. Dep’t of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 502, 468 A.2d 150 (1983) (imposing on a parent corporation liability for costs of clean-up of environmental contamination caused by its subsidiary, based on the conclusion that “the privilege of incorporation should not, under the circumstances that obtain here, become a device for avoiding statutory responsibility.”); Coppa v. Director, Div. of Taxation, 8 N.J.Tax 236, 252 (1986) (relying on “public policy considerations” in holding that the shareholders of a validly formed Delaware corporation were liable for New Jersey use tax in connection with the purchase of a power boat by the corporation).
The preceding conclusion derives support from the general failure by General Services and plaintiff to respect separate corporate identities within the UPS-America structure, even though plaintiff argues that the Director is obligated to accord such respect. For example, the agreement between General Services and IBM for the purchase by IBM of the Hitachi equipment names “United Parcel Service Inc.” as the seller. The checks issued by IBM in payment for the Hitachi equipment were payable to “United Parcel Service” and were endorsed by “United Parcel Service.” The endorsement also contains an account number which plaintiff contends was the account number for General Services, but the proofs were inconclusive as to that assertion (see the discussion below). The Term Lease Agreement for the IBM computer equipment named “United Parcel Service Inc.” as the lessee. A witness presented by plaintiff, who was familiar with *339 the IBM transaction, testified that IBM was recalcitrant in changing the name of the corporate entity to the proper UPS-America subsidiary, that is, General Services. The witness failed to explain, however, why, when signing these documents, the representative of General Services could not have simply crossed out the word “Inc.” and inserted “General Services Co.”
Although the purchase order eventually issued to Hitachi on May 12, 1999 was issued by plaintiff, the General Services accounts payable system continued to function at the time. Plaintiff failed to explain satisfactorily why, under these circumstances, the purchase order was issued in its name. Plaintiff also issued its standard form resale certificate to Hitachi showing plaintiff as the purchaser. A witness for plaintiff testified that he was unaware of what level of authority was required in order to change the form to designate General Services as the purchaser. When asked whether the designation of plaintiff as purchaser was the result of a computer error, the witness responded “no.” Testimony of another witness established that the regional tax manager had the authority to authorize the issuance of a resale certificate naming General Services as the purchaser, and that a blank resale certificate could have been downloaded from the internet. Plaintiff and General Services apparently did not regard naming General Services as the purchaser as important enough to locate the person with the authority to change the purchaser’s name on the standard resale certificate form or to prepare a proper resale certificate on an easily available blank form. Cf. General Trading Co. v. Director, Div. of Taxation, 83 N.J. 122, 416 A.2d 37 (1980) (holding that a corporation is bound by the tax consequences of its business decisions).
Even the application for the opening of a bank account, allegedly for General Seivices, names the applicant as “United Parcel Service” with an address in Mahwah, New Jersey. A request for a taxpayer identification number in connection with the opening of the account names the applicant as “United Parcel Service.” This form was prepared by General Services or another UPS-America subsidiary. Finally, the refund claim which is the basis for this appeal named plaintiff as the taxpayer, but stated that “United *340 Parcel Service (UPS) inadvertently paid in duplicate New Jersey Sales or Use Tax to various vendors ... The largest single transaction was for a vendor Hitachi Data Systems on September 15, 1999 with an invoice amount of $4,602,132 and a tax overpayment of $276,128.” Thus, even in the refund application prepared by it, plaintiff paid no regard to separate corporate identities.[5]
The foregoing demonstrates a lack of concern by plaintiff and General Services as to the designation of the appropriate corporate entity as the purchaser of the Hitachi equipment. This casual intermixing of corporate names supports my finding and conclusion that the tax payment by plaintiff properly can be treated as a tax payment on behalf of General Services.
Based on the preceding discussion, I need not address the Director’s argument that General Services’ purchase of the Skyline and resale to IBM did not satisfy the statutory requirement that personal property must be resold “as such” to qualify as an exempt sale for resale. However, I will address the argument briefly. The Director contends that General Services purchased a Skyline 627 from Hitachi and sold a Skyline 427 to IBM. I find that the documents discussed above demonstrate that Hitachi agreed to sell a 427 to General Services, with the configuration of the equipment as a 627 (or 527) to terminate at the end of April 1999. IBM agreed to purchase a 427. The equipment sold to General Services and purchased by IBM, therefore, was similarly configured, and the transaction satisfies the “as such” requirement contained in N.J.S.A. 54:32B-2(e).
Judgment will be entered denying plaintiffs refund claim.

 The parties have not distinguished between sales tax and use tax. Based on the discussion below, it appears that the refund claim relates to use tax, but, as *322 also discussed below, whether the tax is denominated sales tax or use tax does not affect my analysis or conclusions.

 All quotations from the Sales and Use Tax Act are from the statutes in effect in 1999. N.J.S.A. 54:32B-2(e) and 2(h) were amended by L. 2005, c. 126 § 1, effective October 1, 2005. N.J.S.A. 54:32B-2(e), 2(h), 3(a) and-6 were amended by L. 2006, c. 44, §§ 1,2, and 5, effective October 1, 2006. The amendments do not change the substance of the quoted language and have no effect on the analysis and conclusions in this opinion.

 The sale documents between Hitachi and General Services could be construed to provide that the sale from Hitachi to General Services was not consummated until payment in full of the purchase price was made by General Services. This did not occur until September 20, 1999. However, the parties have treated the sale transaction as having been consummated at the latest by May 1, 1999. I will, therefore, view the transaction in accordance with the positions taken by the parties.

 The tax payment by plaintiff appears to have been the only tax payment made in connection with the Hitachi-General Services-IBM sale transactions. As set forth in the factual discussion above, Hitachi collected no sales tax from General Services in connection with the sale of the Skyline, and General Services made no use tax payment. IBM agreed to provide a tax exemption certificate in connection with its purchase of the equipment but failed to do so. The record contains no proofs as to the collection or remittance of sales or use tax in connection with IBM's purchase. Treating plaintiff's tax payment as a payment on behalf of General Services, therefore, will not result in any tax pyramiding.

 The refund claim does not assert, as a basis for the claim, that the purchase from Hitachi was a sale for resale. Although the Director contends that this suggests that the sale for resale claim was an afterthought, I find that the evidence established that General Services was aware of the sale for resale exemption in connection with its purchase from Hitachi.