DeALMEIDA, P.J.T.C.
The first question before the court is whether the amount charged by an electric public utility for the distribution of electricity through the local distribution infrastructure to a consumer is subject to sales tax. For the reasons explained more fully below, *238 the court concludes that the amount charged for the distribution of electricity through the local distribution infrastructure to a consumer is subject to sales tax as receipts from the “the transportation or transmission of natural gas or electricity by means of mains, wires, lines or pipes, to users or customers,” a taxable “utility service” within the meaning of N.J.S.A. 54:32B-2(hh).
In addition, the court considers whether various charges the Legislature and Board of Public Utilities (“BPU”) authorized electric public utilities to charge customers to recover expenses associated with electricity generation, demand management, customer services, energy-related social programs, and other costs, should be included in receipts from utility services for the purpose of calculating sales tax. For the reasons stated more fully below, the court concludes all of the charges challenged by plaintiffs are “eharge[s] for any service taxable,” N.J.S.A. 54:32B-2(d)(later amended), and part of “the total amount of consideration” paid for those services under N.J.S.A 54:32B-2(oo). Those charges are, therefore, properly included in receipts for utility services when calculating sales tax.
As a result of these conclusions, the court affirms the final determinations of the Director, Division of Taxation denying plaintiffs’ requests for refunds of sales tax.
I. Findings of Fact
The court makes the following findings of fact based on the submissions of the parties in support of their cross-motions for summary judgment. R. 1:7-4.
A. Introduction of Competition into the New Jersey Energy Market.
The provision of utility-generated electricity to consumers is accomplished in three parts. First, electricity, defined by the Sales and Use Tax Act as the tangible commodity “energy,” N.J.S.A. 54:32B-2(g) and (gg), is generated by a power plant or other source (“electricity generation”). Second, electricity, once generated, is transmitted through high-voltage power lines and other infrastructure to the local distribution infrastructure (“elec *239 tricity transmission”). Finally, the electricity is distributed through the local distribution infrastructure, comprised of low-voltage lines and other assets, to customers for consumption (“electricity distribution”). These three stages will be referred to as “electricity services” in this opinion.
Prior to the introduction of competition into the electricity market in New Jersey, electricity services were provided to consumers by large, vertically-integrated, electric public utility monopolies that controlled all aspects of electricity generation, transmission and distribution. All consumers, except those that generated their own electricity, were required to purchase electricity, electricity transmission, and electricity distribution from the electric public utility monopoly assigned to the service territory in which the customer was located. During that time,
[e]ach company owned power generation plants, plus transmission, distribution, and customer service facilities. The companies had virtual monopolies over their geographically-defined service territories. The charges for all services!,] power supply, electric transmission and distribution, and such customer services as connects and disconnects, metering, billing, and account administration were “bundled” and billed at a single price.
[In re: PSE & G Co.’s Rate Unbundling, Stranded Costs and, Restructuring Filings, 330 N.J.Super. 65, 83, 748 A.2d 1161 (App.Div.2000), aff'd, 167 N.J. 377, 771 A.2d 1163, cert. denied, 534 U.S. 813, 122 S.Ct. 37, 151 L.Ed.2d 11 (2001).]
In order to serve its territory and guarantee an adequate and reliable supply of energy, each electric public utility monopoly made significant investments in the building, development and maintenance of electricity generation assets, and incurred significant liabilities securing supplies of electricity through contracts with third-party, non-utility electricity generators.
On February 9, 1999, the Legislature introduced competition into the electricity market in New Jersey by enacting L. 1999, c. 23, the Electric Discount and Energy Competition Act (the “Competition Act”). See N.J.S.A. 48:3-49, et seq. The Act gives the consumer the ability to purchase electricity generation and transmission in the marketplace or opt to receive electricity generation and transmission from the local electric public utility. N.J.S.A. 48:3-51. Customers, however, may not select a distributor of electricity. All electricity distribution is provided to consumers by the local electric public utility with monopoly control over the *240 consumer’s geographic area, even where the customer purchases electricity generation and transmission from a third-party electric power supplier other than their local electric public utility. N.J.S.A. 48:3-50(a)(5).
In addition, customers who do not elect to purchase electricity generation and transmission in the marketplace are, by default, provided those services from their local electric public utility. This is called basic generation service (“BSG”), which is defined by statute as follows:
[E]leetric generation service that is provided to any customer that has not chosen an alternative electric power supplier, whether or not the customer has received offers for competitive supply options, including, but not limited to, any customer that cannot obtain such service from an electric power supplier for any reason, including non-payment for services. Basic generation sendee is not a competitive sendee and shall be fully regulated by the [BPU].
[N.J.S.A. 48:3-51.]
B. Billing for Electricity.
A customer’s consumption of electricity is measured in kilowatt-hours and the amount of kilowatts consumed is identified and calculated at the customer’s meter. Except for customer service charges, all charges on a customer’s electric utility bill are calculated based on the amount of electricity consumed. Customer service charges are assessed for customer account services, which “means metering, billing or such other administrative activity associated with maintaining a customer account.” N.J.S.A. 48:3— 51.
As noted above, before the introduction of competition into the electricity market, all services were bundled together and billed as one charge. See N.J.S.A 48:3-52(a). The Competition Act, however, requires electric public utilities to unbundle electric rate schedules to reveal each service and charge billed to non-residential consumers, including charges authorized by the Legislature and BPU. Ibid. Discrete billing charges “shall include, at a minimum, customer account services and charges, distribution and transmission services and charges and generation services and charges, and the [BPU] may require that additional services and charges be unbundled and separately billed.” N.J.S.A. 48:3-52a. *241 “Billings for such services also shall include charges related to regulatory assets and may include restructuring related costs.” Ibid.
C. Authorized Charges.
At the time competition was introduced into the New Jersey electricity market, the Legislature authorized public electric utilities to assess on consumers a number of charges in addition to charges for generation, transmission and distribution of electricity. Some of the charges allow electric public utilities to recover various expenses including past investments in generation infrastructure and third-party contracts for electricity supply to fulfill the electric public utilities’ statutory and other obligations under the prior monopoly. With respect to these past expenses, the Legislature
determine® that it is in the public interest to:
[[Image here]]
Provide each electric public utility the opportunity to recover above-market power generation and supply costs and other reasonably incurred costs associated with restructuring of the electric industry in New Jersey, the level of which will be determined by the [BPU] to the extent necessary to maintain the financial integrity of the electric public utility through the transition to competition, subject to the achievement of the other goals and provisions of Lthe Competition Act], and subject to the public utility having taken and continuing to take all reasonably available steps to mitigate the magnitude of its above-market electric power generation and supply costs____
[N.J.S.A. 48:3-50e(4).]
The authorized charges are addressed in turn below.
1. Market Transition Charges.
Recognizing the costs that would be incurred by electric public utilities as a result of the introduction of competition into the electricity generation and transmission market, the Legislature authorized electric public utilities to recover certain costs associated with the market transition. According to N.J.S.A. 48:3-61
[simultaneously with the starting date for the implementation of retail choice as determined by the [BPU] ... the rBPUJ shall ... permit each electric public utility the opportunity to recover the following categories of costs through a market transition charge that shall be collected as a limited duration non-bypassable charge payable by all of the electric public utility’s customers ...:
*242 (1) Utility generation plant stranded costs;
(2) Stranded costs related to long-term and short-term power purchase contracts with other utilities ...;
(3) Stranded costs related to long-term power purchase contracts with non-utility generators ... and the costs of new power contracts approved by the board which are the result of the renegotiation, restructuring or termination of previous non-utility generator power purchase contracts ...;
(4) Such restructuring related costs, if any, as the [BPU] determines to be appropriate for recovery in a market transition charge.
b. Costs that may be collected pursuant to subsection a. of this section must be otherwise unrecoverable as a direct result of the implementation of retail choice mandated by subsection a. of section 5 of this act.
“ ‘Stranded cost’ means the amount by which the net cost of an electric public utility’s electric generating assets or electric power purchase commitments ... exceeds the market value of those assets or contractual commitments in a competitive supply marketplace and the costs of buydowns or buyouts of power purchase contracts____” N.J.S.A 48:3-51. In addition to the market transition charges, the BPU authorized electric public utilities to charge a net non-utility generation charge, which recovers costs associated with the purchase of power from non-utility generators and stranded costs associated with such purchases.
2. Transition Bond Charges.
In N.J.S.A 48:3-62a, the Legislature authorized the issuance of transition bonds by electric public utilities: (1) for purposes of recovering a portion of the stranded costs of an electric public utility; (2) for compliance with rate reduction requirements; and (3) for recovering basic generation service transition costs, as approved by the BPU. “The transition bond charges established by the board in bondable stranded costs rate orders shall be assessed against all customers of the electric public utility ... and shall apply equally to each customer of the electric public utility based on the amount of electricity delivered to the customer through the transmission and distribution system of the electric public utility or any successor.” N.J.S.A. 48:3-67. “Financing, or securitizing, stranded costs through the issuance of asset-backed securities mitigates the rate impact of stranded cost recovery because the interest rates through financing are lower than the utility’s historic cost of capital.” In re: PSE & G Co., supra, 330 *243 N.J.Super. at 90, 748 A.2d 1161. The transition bond charge is sometimes known as the securitization charge.
3. Societal Benefits Charges.
With the introduction of competition in the New Jersey electricity market, the Legislature authorized electric public utilities to assess against customers “societal benefits charges” authorized by the BPU to recover costs associated with social programs that electric public utilities are required to provide by law. “Social program” means “a program implemented with board approval to provide assistance to a group of disadvantaged customers, to provide protection to consumers, or to accomplish a particular societal goal, and includes, but is not limited to, the winter moratorium program, utility practices concerning ‘bad debt’ customers, low income assistance, deferred payment plans, weatherization programs, and late payment and deposit policies, but does not include any demand side management program or any environmental requirements or controls____” N.J.S.A. 48:3-51.
According to N.J.S.A. 48:3-60:
a. [Tjhe [BPU] shall permit each electric public utility ... to recover some or all of the following costs through a societal benefits charge that shall be collected as a non-bypassable charge imposed on all electric public utility customers ...:
(1) the costs for the social programs for which rate recovery was approved by the board prior to April 30,1997 ...;
(2) Nuclear plant decommissioning costs;
(3) The costs of demand side management programs that were approved by the board pursuant to its demand side management regulations prior to April 30, 1997...;
(4) Manufactured gas plant remediation costs ...;
(5) The cost, of consumer education, as determined by the board____;
b. There is established in the [BPU] a nonlapsing fund to be known as the “Universal Service Fund.” The board shall determine: the level of funding and the appropriate administration of the fund; the purposes and programs to be funded with monies from the fund; which social programs shall be provided by an electric public utility as part of the provision of its regulated services which provide a public benefit; whether the funds appropriated to fund the “Lifeline Credit Program” established pursuant to [N.J.S.A. 48:2-29.15, et seq.], the “Tenants’ Lifeline Assistance Program” established pursuant to [N.J.S.A. 48:2-29.31, et seq.], the funds received pursuant to the Low Income Home Energy Assistance Program established pursuant to 42 U.S.C. s.8621 et seq., and funds collected by electric and natural gas utilities, as authorized by the board, to offset uncollectible electricity *244 and natural gas bills should be deposited in the fund; and whether new charges should be imposed to fund new or expanded social programs.
Among the charges approved by the BPU pursuant to these statutory provisions, in addition to the societal benefits charge, are: (1) the regulatory asset recovery charge, which recovers costs associated with asbestos removal, decontamination assessments, post-retirement benefits and other costs related to regulatory assets; (2) reactive demand charges, which are intended to penalize customers who draw excessive electricity from the overall power grid; (3) system control charges, associated with appliance cycling load management; and (4) default supply availability charges to recover costs associated with maintaining the availability of the hourly priced default electric supply service.
D. Tax Treatment of Electricity Charges.
Prior to the enactment of the Competition Act, energy customers paid a Franchise and Gross Receipts Tax (“FGR”) that was incorporated in the bundled charge for electric utility services. The tax was eliminated effective January 1, 1997. N.J.S.A. 54:10A-5.25(a).
At that time, as part of the tax reform associated with the deregulation of the electric industry, the sales and use tax was expanded in two ways. First, the definition of “tangible personal property” was amended to include “electricity.” N.J.S.A 54:32B-2(g). In addition, “[e]nergy” was defined to include “electricity.” N.J.S.A. 54:32B-2(gg). Second, the list of services the receipts from which are subject to sales and use tax was also changed to include “utility services.” N.J.S.A. 54:32B-3(b)(7). “Utility services” is defined as “the transportation or transmission of natural gas or electricity by means of mains, wires, lines or pipes, to users or customers.” N.J.S.A. 54:32B-2(hh). In addition, effective January 1, 1998, the Legislature amended N.J.S.A. 54:32B-8.11, which exempts from the sales tax receipts from the transportation of persons or property. At that time, the Legislature determined that the exemption would not apply to receipts from the transpor *245 tation of “energy.” L. 1997, c. 162, § 22.[1]
Electric public utilities and third-party suppliers of electricity are required to include sales tax in the rates charged to customers for all electric services. “All sellers of energy or utility services shall include the tax imposed by the ‘Sales and Use Tax Act’ within the purchase price of the tangible personal property or service.” N.J.S.A. 54:32B-14(e). Accordingly, sales tax does not appear as a separate line item but is embedded in the tariff rates charged to electricity customers.
E. Atlantic City Showboat, Inc.’s Refund Claim.
Plaintiff Atlantic City Showboat, Inc. (hereinafter “AC Showboat”) operates a casino resort in Atlantic City. From January 1, 2002 through December 31, 2005, AC Showboat purchased electricity and electricity services for four accounts into which the casino resort was divided: the main casino area (the “801 Boardwalk Account”), the parking garage area (the “Parking Garage Account”), a warehouse facility (“500 W. Parkway Account”), and the casino street front signage (“Delaware Ave. Account”).
During the entire refund period, AC Showboat purchased all of its electricity and electricity delivery services from the Atlantic City Electric Company (“ACE”), which was doing business as Conectiv Power Delivery (“Coneetiv”), for the Parking Garage Account, the 500 W. Parkway Account and the Delaware Ave. Account. For the refund period January 1, 2002 through July 31, 2003, AC Showboat also purchased its electricity and electricity delivery services from ACE for its 801 Boardwalk Account.
Invoices for the four AC Showboat accounts included, in addition to charges for generation, transmission and customer services, the following itemized charges on which sales tax was assessed and paid by AC Showboat: distribution service charges, *246 reactive demand charges, societal benefit charges, system control charges, default supply service availability charges, regulatory assets recovery charges, market transition charges, transition bond charges and net non-utility generation charges.
For the refund period August 1, 2003 through December 31, 2005, AC Showboat purchased electricity generation and transmission for the 801 Boardwalk Account from an electric power supplier, Pepeo Energy Services, Inc. (“Pepeo”). According to the Pepeo Service Agreement, AC Showboat was required to purchase 100% of its electric generation and transmission for this account from Pepeo. The agreement also provided that Pepeo was required to transmit the electricity to a specified point of delivery, CPD—New Jersey, which is the electricity distribution system owned by ACE. According to the agreement, title to the electricity passed to AC Showboat and Pepco’s transmission service was completed once the electricity reached the ACE distribution system. After the electricity was transmitted by Pepeo to the ACE distribution system, ACE distributed the electricity to AC Showboat.
While AC Showboat purchased electricity generation and transmission from Pepeo for the 801 Boardwalk Avenue Account, AC Showboat received invoices from ACE for electricity distribution services. Those invoices did not contain electricity generation or transmission charges, but did include customer service charges, distribution service charges, reactive demand charges, societal benefit charges, system control charges, default supply service availability charges, regulatory assets recovery charges, market transition charges, transition bond charges and net non-utility generation charges.
During the refund period, AC Showboat paid sales tax with respect to its electricity services and made a timely request for a refund from the Director, Division of Taxation of those taxes in the following amounts:

Service/Charge Sales Tax Paid Refund Claimed

$216,911.16 Generation 0.00
$ 12,811.88 Transmission 0.00
*247 Distribution $ 67,475.67 $ 67,475.67
Market Transition Charges $ 43,776.72 $ 43,776.72
Net Non-Utility Generation Charges $193,839.41 $193,839.41
Transition Bond Charges $ 55,965.81 $ 55,965.81
Societal Benefits Charges $ 22,015.92 $ 22,015.92
Additional Charges [2] $ 8,783.79 $ 8,783.79
Customer Service Charges $ 498.91 0.00
Total $622,079.27 $391,857.32
As previously noted, AC Showboat agrees that charges for electricity generation and transmission are subject to sales tax. It also does not contest application of the sales tax to customer service charges. AC Showboat contends, however, that electricity distribution is not a “utility service” within the meaning of N.J.S.A. 54:32B-2(hh) and receipts from that service are not, therefore, subject to sales tax. In addition, AC Showboat argues that the other charges it paid, while authorized by statute as permissible charges by electric public utilities against consumers, are not related to the provision of electricity to AC Showboat during the relevant period but recoup past investments in electricity generation. As a result, AC Showboat argues, the charges should not be included in “receipts” for “utility services” when calculating sales tax.
On October 3, 2006, the Director, Division of Taxation issued a final determination denying AC Showboat’s refund claim.
On January 2, 2007, AC Showboat filed a Complaint in this court challenging the Director’s final determination.
F. Our Lady of Lourdes Medical Center, Inc. ’s Refund Claim.
Plaintiff Our Lady of Lourdes Medical Center, Inc. (hereinafter “Lourdes”) operates a non-profit, regional medical center in Camden. During the period February 22, 2002 through May 24, 2005, Lourdes purchased electricity generation and delivery services for *248 four accounts into which the medical center was divided: the main medical center building (“Main Building Account”), the nursing building (“Nursing Building Account”), the ambulatory care center (“Ambulatory Care Center Account”) and its outdoor lighting (“Lighting Account”).
During the entire refund period, Lourdes purchased all of its electricity generation and delivery services from Public Service Electric and Gas Company (“PSE & G”) for its Lighting Account. For the refund period January 1, 2002 through July 31, 2003, Lourdes purchased all of its electricity generation and delivery services from PSE & G for its Main Building Account, Nursing Building Account and Ambulatory Care Center Account. Each of the PSE & G invoices sent to Lourdes reflected a “Total Electric Charge” comprised of separately itemized charges for customer service charges, electric generation charges, transmission charges, distribution charges, market transition charges, securitization charges, and societal benefits charges.
For the refund period August 1, 2003 through May 24, 2005, Lourdes purchased electricity generation and transmission for those three accounts from an electric power supplier, Reliant Energy Solutions East, LLC (“Reliant”). According to the Reliant Service Agreement, Lourdes was required to purchase 100% of its electricity generation and transmission for those accounts from Reliant. The agreement also provided that Reliant was required to transmit the electricity to a specified point of delivery: the point at which the local distribution company’s transmission and/or distribution system is interconnected with the grid. According to the agreement, title to the electricity passed to Lourdes and Reliant’s transmission service was completed once the electricity reached the PSE & G local distribution system.
While Lourdes received electricity generation and transmission from Reliant, Lourdes continued to receive invoices from PSE & G for electricity distribution services. Those invoices did not contain generation or transmission charges, but did include distribution charges, customer service charges, societal benefit charges, market transition charges, and transition bond charges.
*249 During the refund period, Lourdes paid sales tax with respect to its electricity services and made a timely request for a refund from the Director in the following amounts:

Service!Charge Sales Tax Paid Refund Claimed

Generation $ 47,172.16 0.00
Transmission $ 3,501.20 0.00
Distribution $ 31,316.67 $31,316.67
Market Transition Charges $ 3,833.20 $ 3,833.20
Transition Bond Charges $ 22,321.35 $22,321.35
Societal Benefits Charges $ 10,102.44 $10,102.44
Customer Service Charges $ 5,182.43 $ 5,182.43
Total $123,429.45 $72,756.09
As previously noted, Lourdes agrees that charges for electricity generation and transmission are subject to sales tax. Lourdes contends, however, that electricity distribution is not a “utility service” within the meaning of N.J.S.A. 54:32B-2(hh) and receipts from that service are not, therefore, subject to sales tax. In addition, Lourdes contends that the other charges it paid, while authorized by statute as permissible charges by electric public utilities against consumers, are not related to the provision of electricity to Lourdes during the relevant period but recoup past investments in electricity generation. As a result, Lourdes argues, the charges should not be included in “receipts” for “utility services” when calculating sales tax.
On January 26, 2007, the Director issued a final determination denying Lourdes’ refund request.
On April 11, 2007, Lourdes filed a Complaint in this court challenging the Director’s final determination.
After discovery, the parties cross-moved for summary judgment. Having heard oral argument from the parties, the court consolidated the two matters for purposes of decision on the cross-motions.
II. Conclusions of Law
Summary judgment should be granted where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no *250 genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995), our Supreme Court established the standard for summary judgment as follows:
[W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
“The express intent of the Brill decision was to ‘encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.’ ” Township of Howell v. Monmouth County Bd. of Taxation, 18 N.J.Tax 149, 153 (Tax 1999) (quoting Brill, supra, 142 N.J. at 541, 666 A.2d 146). The court concludes that this matter is ripe for decision by summary judgment. There are no material facts genuinely in dispute between the parties and the validity of the Director’s final determinations can be decided by application of the law to the facts.
A. Applicability of Sales Tax to Electricity Distribution Charges.
The court’s analysis begins with the familiar principle that the Director’s interpretation of tax statutes is entitled to a presumption of validity. “Courts have recognized the Director’s expertise in the highly specialized and technical area of taxation.” Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J.Tax 584, 589 (Tax 1997) (citing Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984)). The scope of judicial review of the Director’s decision with respect to the imposition of a tax “is limited.” Quest Diagnostics, Inc. v. Director, Div. of Taxation, 387 N.J.Super. 104, 109, 903 A.2d 442 (App.Div.), certif. denied, 188 N.J. 577, 911 A.2d 69 (2006). The Supreme Court has directed the courts to accord “great respect” to the Director’s application of tax statutes, “so long as it is not plainly unreasonable.” Metromedia, supra, 97 N.J. at 327, 478 A.2d 742. See also GE Solid State, Inc. v. Director, Div. of *251 Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993) (“Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.”). However, judicial deference is not absolute. An administrative agency’s interpretation of the law that is plainly at odds with the statute will not be upheld. See Oberhand v. Director, Div. of Taxation, 193 N.J. 558, 568, 940 A.2d 1202 (2008) (citing GE Solid Stole, supra, 132 N.J. at 306, 625 A.2d 468).
Additionally, the Sales and Use Tax Act was enacted as a revenue raising measure and is intended to be broadly read. Adamar of New Jersey v. Director, Div. of Taxation, 17 N.J.Tax 80, 85-86 (Tax 1997), aff'd, 18 N.J.Tax 70 (App.Div.1999); Advo, Inc. v. Director, Div. of Taxation, 25 N.J.Tax 504, 511 (Tax 2010). “Our Legislature has established a presumption that transactions are taxable.” UPS Oasis Supply Corp. v. Director, Div. of Taxation, 23 N.J.Tax 320, 334 (Tax 2007).
It is against this backdrop of precedents that the court must evaluate the Director’s final determinations. The relevant provisions of the Sales and Use Tax Act are concise. “There is imposed and there shall be paid a tax of 6%[3] upon ... the receipts from every retail sale of tangible personal property____” N.J.S.A. 54:32B-3(a). “‘Tangible personal property’ includes electricity....” N.J.S.A. 54:32B-2(g). There is no dispute that receipts from electricity generation, which produces electricity for the purchaser, are subject to sales tax.
In addition, “[ojnly sales of specifically enumerated services are subject to” sales and use tax. Campo Jersey, Inc. v. Director, Div. of Taxation, 22 N.J.Tax 251, 270 (Tax 2005)(quotations omitted), aff'd, 390 N.J.Super. 366, 915 A.2d 600 (App.Div.), certif. denied, 190 N.J. 395, 921 A.2d 448 (2007). “There is imposed and there shall be paid a tax of 6% upon ... [t]he receipts from every sale, except for resale, of ... [ujtility service provided to persons in this State, any right or power over which is *252 exercised in this State.” N.J.S.A. 54:32B-3(b)(7). This is the only service enumerated in the Sales and Use Tax Act that could possibly apply to plaintiffs’ refund claim. “[UJtility service” is “the transportation or transmission of natural gas or electricity by means of mains, wires, lines or pipes, to users or customers.” N.J.S.A. 54:32B-2(hh).
Statutory construction begins with the statute’s plain language. Merin v. Maglaki, 126 N.J. 430, 434, 599 A.2d 1256 (1992). “A statute should be interpreted in accordance with its plain meaning if it is clear and unambiguous on its face and admits of only one intei’pretation.” Board of Educ. v. Neptune Twp. Educ. Ass’n, 144 N.J. 16, 25, 675 A.2d 611 (1996) (quotations omitted). “[T]he best approach to the meaning of a tax statute is to give to the words used by the Legislature their generally accepted meaning, unless another or different meaning is expressly indicated.” Public Serv. Elec. & Gas Co. v. Township of Woodbridge, 73 N.J. 474, 478, 375 A.2d 1165 (1977) (quotations omitted). “‘The duty of the Director, and this court, is to give meaning to the wording of the statute and, where the words used are unambiguous, apply its plain meaning in the absence of a legislative intent to the contrary.’ ” Vassilidze v. Director, Div. of Taxation, 24 N.J.Tax 278, 291 (Tax 2008) (quoting Sutkowski v. Director, Div. of Taxation, 312 N.J.Super. 465, 475, 712 A.2d 229 (App.Div.1998)).
In addition, when determining the meaning of statutes,
words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.
[N.J.S.A. 1:1-1.]
Reading N.J.S.A. 54:32B-2(hh) in context and applying the “ordinary and well-understood meaning” of the words “transportation or transmission of natural gas or electricity by means of mains, wires, lines or pipes, to users or customers,” it is clear that the distribution charges paid by plaintiffs are “utilities services,” the receipts from which are subject to sales tax. AC Showboat and Lourdes paid distribution charges for the service of having *253 electricity transported to them by their local electric public utilities through low-voltage wires and other equipment of the local distribution infrastructure to the point of consumption where plaintiffs used the electricity for their businesses. It is the movement of electricity in the final phase of its journey from the source of its generation to its place of consumption that is the basis of the distribution charge. The common understanding of transportation and transmission is the movement of a thing from one place to another. That proposition is too plain to require extended discussion. Here, the distribution charge is levied in exchange for the movement of electricity, which by law is considered tangible personal property for sales and use tax purposes, N.J.S.A. 54:32B-2(g), through the local distribution network to plaintiffs for consumption.
The court is mindful of plaintiffs’ argument that “transmission,” as it appears in N.J.S.A. 54:32B-2(hh), must be given its technical meaning in the energy industry as encompassing only the movement of electricity from the point of generation along high-voltage power lines to the local distribution infrastructure. See N.J.S.A. 1:1-1 (“Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning.”). According to plaintiffs, because of the technical meaning of “transmission” N.J.S.A. 54:32B-2(hh) applies sales tax only to receipts from electricity transmission services. If transmission was the only verb in N.J.S.A. 54:32B-2(hh), plaintiffs’ argument might well prevail.
Plaintiffs, however, overlook the fact that N.J.S.A. 54:32B-2(hh) applies the sales tax to receipts from both the “transportation” and “transmission” of electricity. If, as plaintiffs contend, the Legislature had intended to limit the scope of the sales tax to the technical meaning of “transmission,” then the Legislature’s inclusion of “transportation” in N.J.S.A. 54:32B-2(hh) would have been a meaningless exercise. It is well established that “ ‘full effect should be given, if possible, to every word of a statute. [The Court] cannot assume that the Legislature used meaningless language.’ ” Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 *254 A.2d 6 (1969). “Transportation” of electricity has no technical meaning in the energy industry. That word, therefore, is given its ordinary meaning in N.J.S.A. 54:32B-2(hh). The sales tax applies to receipts for the movement of electricity whether that movement is accomplished through transmission or distribution. To the extent that the technical meaning of “transmission” is incorporated in N.J.S.A. 54:32B-2(hh), the non-teehnical term “transportation” broadens the reach of the statute beyond mere transmission of electricity to any movement of electricity “by means of mains, wires, lines or pipes.” Distribution charges fit snugly into this category.
The court rejects plaintiffs’ attempt to explain the meaning of “transportation” in N.J.S.A. 54:32B-2(hh) as applying only to the transportation of natural gas. According to plaintiffs, transportation has a technical meaning in the natural gas industry, but no applicability to the electricity industry. Thus, plaintiffs’ argue, the sales tax applies to receipts from the transportation of natural gas and the transmission of electricity, but not the transmission of natural gas or the transportation of electricity. The fault with this argument is that the plain language of N.J.S.A. 54:32B-2(hh) states that the tax is applicable to receipts from the “transportation or transmission of natural gas or electricity.” Receipts from either the transportation or transmission of electricity fall within the ambit of the sales tax. The statute simply is not as finely parsed as plaintiffs profess it to be. Had the Legislature intended for the word “transportation” to apply only to natural gas and the word “transmission” to apply only to electricity it could easily have enacted a statute that explicitly accomplished that objective. It did not do so.
The court’s conclusion is bolstered by the 1997 amendment to N.J.S.A. 54:32B-8.11, a statute which provides an exemption from the sales tax for receipts from the transportation of persons or property. Preparing for the anticipated introduction of competition in the electricity market in New Jersey and the restructuring of the taxation of public utilities, the Legislature created an exception to the exemption for the transportation of “energy.” L. 1997, c. 162, § 22. As noted above, the Legislature also defined *255 energy to include electricity. N.J.S.A. 54:32B-2(gg). Through the enactment of this amendment to N.J.S.A. 54:32B-8.11, the Legislature unequivocally expressed its understanding that the word “transportation” applied to electricity for purposes of the sales tax.
The fact that “utility service” is broadly defined in Title 48 (Public Utilities) does not change the court’s conclusion. N.J.S.A. 48:2-21.34(a) defines “utility service” as “the supply, transmission, distribution or transportation of electricity, natural gas or telecommunications services or any combination of such commodities, processes or services.” Plaintiffs argue that had the Legislature intended to include distribution services within the meaning of utility services for sales tax purposes it would expressly have done so, as it did when defining utility services in N.J.S.A. 48:2-21.34(a). Yet, the public utilities statute includes in its definition of utility service the “transportation of electricity,” which belies plaintiffs’ contention that the word “transportation” has no meaning when applied to electricity. Under Title 48, the “transportation of electricity” is a “utility service.” There was no need to expressly include “distribution” in N.J.S.A. 54:32B-2(hh) to subject receipts from electricity distribution services to the sales tax.
The court also notes that nothing in Title 54 (Taxation) suggests that the Legislature incorporated the Title 48 definition of “utility service” in the Sales and Use Tax Act. Notably, in many instances, where the Legislature incorporated into the Sales and Use Tax Act a definition provided from another statute, it has done so expressly. For example, N.J.S.A. 54:32B-8.6, which exempts from the sales tax certain casual sales of motor vehicles, provides that a “manufactured home, as defined in subsection d. of section 3 of P.L.1983, c. 400 (C. 54:4-1.4) shall not be deemed a motor vehicle for the purposes of this section.” In addition, N.J.S.A 54:32B-8.45, which provides a partial exemption from the sales tax for certain sales by retailers in counties bordering other States, provides that the partial exemption applies to “cigarettes as defined in the ‘Cigarette Tax Act,’ P.L.1948, c. 65 (c. 54:40A-1 et seq.)----” Similarly, N.J.S.A. 54:32B-2(mm) defines “mobile telecommunications service” subject to sales as “the same as that *256 term is defined in the federal ‘Mobile Telecommunications Sourcing Act,’ 4 U.S.C. s.124 (Pub.L.106-252).” There is no mention in N.J.S.A. 54:32B-2(hh) of N.J.S.A. 48:2-21.34(a) or any other provision of the public utilities laws. However, N.J.S.A. 48:2-21.34(a), which concerns rate changes and tax liabilities for public utilities, defines “[s]ales and use tax” as “the sales and use tax liability computed on sales and use of energy and utility service as defined in section 2 of P.L.1966, e. 30 (C. 54:32B-2).” It is clear that the Legislature recognized that utility sendee was defined by N.J.S.A. 54:32B-2 for sales and use tax purposes, and not by any provision in Title 48.
Furthermore, the fact that, as a contractual matter, title to electricity passes to plaintiffs when it arrives at the local distribution infrastructure does not assist plaintiffs’ position. While title to the electricity may pass to plaintiffs when it is delivered to the local electric public utility, and thus transmitted to a user or customer at that point, plaintiffs also pay for the service of moving that electricity through the local distribution network to the place of consumption. As a result, regardless of where title passes, a distribution charge is an amount imposed in exchange for the service of transporting electricity to a user or customer and is subject to sales tax under N.J.S.A 54:32b-2(hh).
B. Inclusion of Electricity-Related Charges in Receipts for Calculating Sales Tax.
The sales and use tax is assessed on “receipts from every sale, except resale, of ... [ujtility service provided to persons in this State____” N.J.S.A. 54:32B—3(b)(7). During the majority of the refund period, February 22, 2002 through September 30, 2005, “receipt” was defined, in relevant part, as
[t]he amount of the sales price of any property and the charge for any service taxable under this act, valued in money, whether received in money or otherwise, including any amount for which credit is allowed by the vendor to the purchaser, without any deduction for expenses or early payment discounts, but ... excluding the cost of transportation where such cost is separately stated in the mitten contract, if any, and on the bill rendered to the purchaser----
IN.J.S.A. 54:32B-2(d)(later amended).]
*257 In the regulation in place between 2002 and 2005, the Director interpreted “receipts” under N.J.S.A. 54:32B-2(d) as follows:
[e]xpenses billed to a customer but incurred by a vendor in making a sale of taxable goods or services, regardless of whether the expenses are taxable or nontaxable, and regardless of whether the expenses are separately billed to a customer, are not deductible from the receipt on which sales tax is computed.
21 N.J.R. 1107 (N.J.A.C. 18:24-1.4(c) (later amended)). To give light to what the Director meant by “expenses,” he incorporated two examples into the regulation. In the first example, receipts for an equipment repairman’s taxable services included charges for time spent doing a repair, travel time, parts, and meals. Id. at Example 1. In the second example, receipts for photography services include charges for the photographs, model fees, meals, travel, and props. Id. at Example 2. In both examples, all of the charges paid by the customers for the services received were included in receipts for calculation of the sales tax.
1. Market Transition Charges.
As noted above, market transition charges
permit each electric public utility the opportunity to recover the following categories of costs ... (1) [u]tility generation plan stranded costs; (2) [sltranded costs related to long-term and short-term power purchase contracts with other utilities ■. ■; (3) [sltranded costs related to long-term power purchase contracts with non-utility generators ...; (4) [s]ueh restructuring related costs, if any, as the fBPU] determines to be appropriate....
[N.J.S.A. 48:3—61(a).]
Stranded costs are defined as:
the amount by which the net cost of an electric public utility’s electric generating assets or electric power purchase commitments ... exceeds the market value of those assets or contractual commitments in a competitive supply marketplace and the costs of buydowns or buyouts of power purchase contracts.
[N.J.S.A. 48:3-51.1
In other words, market transition charges recoup losses related to the electric public utilities’ prior investments in the electric generation infrastructure and power supply contracts made when the electric public utilities had monopoly control of the electricity market. Local electric public utilities were required to make the initial investments and contract commitments in order to fulfill their statutory and regulatory obligations to provide sufficient and reliable energy sources during the statutory monopoly. By order *258 ing local electric public utilities to relinquish monopoly control, the Legislature created stranded costs for the local electric public utilities, by altering the value of those investments and contractual obligations. By statute, these costs are collected from the customers of local electric public utilities, even if those customers purchase electricity from third-party generators. In the present cases, plaintiffs paid market transition charges as a cost of electricity distribution services, a taxable service. These charges, like the cost of model fees, meals, and travel in the examples in the Director’s regulation, were part of the “charge” for the distribution of plaintiffs’ electricity. See N.J.S.A. 54:32B-2(d).
Plaintiffs make the point that stranded costs are, by definition, associated only with investments and contractual commitments related to the generation and supply of electricity and not the distribution of electricity, which was the only service provided by their local electric public utilities after plaintiffs entered into third-party electricity supply contracts and thus should not be eonsidei’ed part of the taxable receipts. There is, however, no express provision in N.J.S.A. 54:32B-2(d) that a charge for a service must be related to the provision of that service. “Receipts” for sales tax purposes include “the charge for any service taxable” under the Act. Whatever consideration was paid for the seivice constitutes a receipt whether that consideration can be traced to an element of the provision of the seivice or not. Plaintiffs paid market transition charges for the distribution of their electricity. Those charges, including net non-utility generation charges, were authorized by law as a cost of electricity distribution services and constitute an element of the consideration plaintiffs paid to receive their electricity. As a result, the market transition charges are part of the taxable receipts for utility service.
2. Transition Bond Charges.
A similar rationale applies to transition bond charges, which recoup local electric public utility expenses associated with bonds issued “[f]or purposes of recovering a portion of the stranded costs____” N.J.S.A. 48:3-62(a). These charges, authorized by *259 statute and designed to ameliorate the negative economic effects of competition on the prior electric utility monopolies, were a “charge for any service taxable under” the Act. Plaintiffs paid the transition bond charges for the utility services they received from their local electric public utility.
S. Societal Benefit Charges.
Societal benefit charges reflect the electric public utility’s costs associated with government mandated social programs, demand side management costs, nuclear decommissioning costs, consumer education, and other costs. N.J.S.A. 48:3-60. Local electric public utilities are permitted by statute to impose these costs on customers. N.J.S.A. 48:3-60(a). The money collected is spent by electric public utilities on social programs required by the Legislature and BPU, such as a winter moratorium for the poor, serving “bad debt” customers, providing assistance to low-income individuals, providing weatherization, environmental remediation programs, and consumer education. N.J.S.A. 48:3-60(a)(1)—(5).
Operation of these programs is a mandatory expense for electric public utilities. The Legislature authorized local electric public utilities to include these expenses in the cost of electricity distribution. Societal benefit charges are, therefore, an element of the “charge for any service taxable under” the Act, N.J.S.A. 54:32B-2(d), and plaintiffs paid those charges in exchange for the distribution of their electricity.
Plaintiffs’ characterization of the societal benefit charges as taxes, upon which imposition of the sales tax would be inappropriate, is not convincing. Societal benefits charges are not general levies by the Legislature to raise revenue for the general fund to finance governmental operations. Instead, the Legislature and BPU, as part of its regulation of public utilities, requires electric public utilities to administer a variety of programs related to energy consumption, provision of utility service to at-risk populations, demand side management, and other issues. The costs incurred by the electric public utilities to administer these pro *260 grams are expenses related to the provision of electricity services. By law, the electric public utilities may recoup those costs through the societal benefit charges on customers’ electricity distribution bills. Electricity customers, such as plaintiffs, are not being taxed by the State to pay for social programs. They are, instead, paying expenses of the local public utilities. The societal benefits charges, including default supply service availability charges, reactive demand charges, regulatory assets recovery charges and systems control charges, are charges for distribution services subject to tax under N.J.S.A. 54:32B-2(d).
4. Customer Service Charges.
Customer service charges are assessed for customer account services, which “means metering, billing or such other administrative activity associated with maintaining a customer account.” N.J.S.A 48:3-51. Only Lourdes challenges inclusion of customer service charges in receipts for utility services for sales and use tax purposes. There is little doubt that the customer service charges paid by Lourdes were consideration paid in exchange for the distribution of Lourdes’ electricity. As noted above, electricity consumption is measured at the consumer’s meter, the point at which electricity is delivered to the user. The customer service charges pay for metering, billing and other administrative activities associated with the delivery of electricity to consumers, such as AC Showboat and Lourdes.
C. Effect of 2005 Amendment of N.J.S.A. 54:32B-2(d).
Effective October 1, 2005, the sales and use tax statute was amended to conform to the multistate Streamlined Sales and Use Tax Agreement. See L. 2005, c. 126. The definition of receipt was amended as follows: “ ‘Receipt means the amount of the sale price of any tangible personal property ... or service taxable under this act.’ ” N.J.S.A. 54:32B-2(d). In addition, “Sales price” is defined as follows:
(1) “Sales price” is the measure subject to the sales tax and means the total amount of consideration, including cash, credit, property, and services, for which *261 personal property or services are sold, leased, or rented, valued in money, whether received in money or otherwise, without any deduction for following:
(A) The seller’s cost of the property sold;
(B) The cost of materials used, labor or service cost, interest, losses, all costs of transportation to the seller, all taxes imposed on the seller, and any other expense of the seller;
(C) Charges by the seller for any services necessary to complete the sale;
(D) Delivery charges;
(E) Installation charges; and
(f) The value of exempt personal property given to the purchaser where taxable and exempt personal property have been bundled together and sold by the seller as a single product or piece of merchandise.
[N.J.S.A. 54:32B-2(oo).]
This change in definition, which applies to a limited number of months of the refund periods at issue here, does not change the court’s conclusion. As noted above, the various charges paid by plaintiffs for the distribution of their electricity constituted an element of the consideration paid for electricity distribution services. The amended statute expressly defines sales price as “the total amount of consideration” paid for a taxable service. N.J.SA 54:32B-2(oo). Thus, all the charges at issue are included in receipts subject to sales tax, as each make up a part of the total consideration paid for the provision of electricity distribution services to plaintiffs.
For the above-stated reasons, plaintiffs’ motions for summary judgment are denied and the Director’s cross-motions for summary judgment are granted. Final Judgments affirming the Director’s final determinations are enclosed.

 The statute was later amended to exclude from the transportation exemption receipts from "delivery charges; transportation services provided by a limousine operator; and the transportation of energy.” N.J.S.A. 54:32B~8.11; L. 2006, c. 44, § 8, effective July 2, 2006, operative October 11, 2006.

 These charges include default supply service availability charges ($920.35), reactive demand charges ($822.73), regulatory assets recovery charges ($6,709.67), and systems control charges ($331.04).

 The sales tax rate during the periods at issue was 6%. Effective October 1, 2006, the sales tax was increased to 7%. See L. 2006, c. 44.